MARIA TENORIO,            )
                                     )
          Plaintiff,      )
                                     )
          v.             )    No. 13 C 5170
                                     )
CAROLYN W. COLVIN, Acting    )    Magistrate Judge Finnegan
Commissioner of Social Security,    )
                                     )
          Defendant.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Maria Tenorio seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416(i), 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants the Commissioner's motion, denies Plaintiff's motion, and affirms the decision to deny disability benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on November 1, 2006, alleging that she became disabled on January 1, 2003 due to depression and ankle problems, including a femur fracture. (R. 103, 290). The Social Security Administration ("SSA") denied her application initially on December 8, 2006, and again upon reconsideration on April 13, 2007. (R. 103-04). After Plaintiff's timely request, she had an initial hearing in this matter on March 3, 2009. (R. 74-102). On May 27, 2011, the Appeals Council remanded Plaintiff's case for a second hearing, because the recording device at the initial hearing failed to record all of

the testimony. (R. 114-17). Administrative Law Judge Janice M. Bruning (the "ALJ") held the second hearing in this matter, without incident, on October 27, 2011. (R. 35). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from medical expert Kathleen O'Brien (the "ME") and vocational expert Aimee Mowery (the "VE"). (*Id.*). A few months later, on February 16, 2012, the ALJ found that Plaintiff is not disabled because she was capable of performing her past work as a telephone operator and in customer service, as well as other jobs, prior to her December 31, 2005 date last insured ("DLI"). (R. 26-28). Plaintiff requested review of the ALJ's decision, and on May 1, 2013, the appeal was denied. (R. 7-11). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for remand, Plaintiff argues that the ALJ erred in (1) determining her physical residual functional capacity ("RFC") assessment; (2) evaluating the opinion of her treating psychiatrist, Dr. Walter A. Pedemonte, regarding her mental health; and (3) making a flawed credibility determination. As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and does not require reversal or remand.

## FACTUAL BACKGROUND

Plaintiff was born on March 9, 1957, and was 48 years old as of her DLI. (R. 216). She lives in a house with her husband, who is disabled due to Parkinson's disease. (R. 39-40). Plaintiff earned a GED, and worked in a printing company as a machine operator from 1989 to 1997. (R. 39, 63, 95-96, 291). Plaintiff testified that she left that job due to pain when standing for long periods. (R. 291; 522). She was then supported by her husband for a while, but began working at Sak's as a customer

service agent and a telephone operator in mid-2000, when her husband's symptoms became too severe for him to continue working. (R. 51-52, 63, 96, 291, 522). Plaintiff stopped working at Sak's after about a year and a half, because the call center where she worked closed. (*Id.*). She also testified that she was having panic attacks, trouble concentrating, and trouble handling work pressures while at Sak's. (*Id.*). Plaintiff then had trouble finding work until 2004, when she got a job doing filing for one of her doctors. (R. 50, 96, 291, 327, 522). She testified that she only worked at her doctor's office for a few weeks before she ceased working due to the same problems she had while working Sak's. (*Id.*).

## A. Medical and Psychiatric History

### 1. 1994-1998

Plaintiff's earliest treatment records are from January 24, 1994, when she received treatment from Dr. Linda Bonvissuto, an internist, for abdominal pain, gastrointestinal problems, and headaches. (R. 651). Following Plaintiff's 1994 visit with Dr. Bonvissuto, there is a gap in Plaintiff's medical records until November 1996, when she had sinus surgery to alleviate various sinus conditions. (R. 639-640). Then there is another gap in the medical records until July 1997, when Plaintiff complained of back pain, and had whole body bone scan. (R. 636). The bone scan produced normal results, except for a mild issue with Plaintiff's right humerus bone that had no relationship to Plaintiff's pain symptoms. (*Id.*).

A few months after Plaintiff's bone scan, on October 29, 1997, she visited Dr. Michael Brage, a foot and ankle surgeon, complaining of pain in her heels, ankles and calves for the past eight months. (R. 637-38). Dr. Brage noted flatness in Plaintiff's

arches and that she had pain on palpation, but she also displayed good pulses and had no other deformity in her feet. (*Id.*). The doctor diagnosed Plaintiff with "possible" avascular necrosis of her tali.[1] (*Id.*). He also noted that Plaintiff had a bone scan and x-rays that did not support the diagnosis, but thought an MRI of her ankles should be done to rule out the possibility she had the disease. (*Id.*). Plaintiff's subsequent MRI produced normal results. (R. 629; 633).

On January 27, 1998, Plaintiff visited a neurologist, Dr. Donald Kulhman, to determine if her ankle and foot pain resulted from neurological issues. (R. 633-35). At that time, Plaintiff reported a life-long pain in her ankles and feet that had increased in the past seven years, and that at times extended into her calves, thighs and low back. (R. 633). She denied sensory loss or problems with weakness. (*Id.*). Plaintiff also reported trying various pain medications in the past, but said she stopped using them because they made her feel "like a zombie" or "not herself." (*Id.*)

Dr. Kulhman found Plaintiff was "entirely within normal limits" upon neurological examination, and found her motor power, movements, sensation and gait were normal. (R. 634). The doctor also noted Plaintiff had normal MRIs of the ankles and low back, a normal EMG, and a normal nerve conduction study in the past. (R. 633). Dr. Kulhman determined Plaintiff's pain was not likely neurological in origin, but recommended

---

[1]     "Avascular necrosis" refers to the "temporary or permanent cessation of blood flow to the bones [which] causes the bone tissue to die, resulting in fracture or collapse of the entire bone." http://medical-dictionary.thefreedictionary.com/avascular+necrosis   (All websites in this opinion were last visited on September 12, 2014).   The "tali" supports the "talus," the ankle joint. http://medical-dictionary.thefreedictionary.com/sustentaculum+tali; http://medical-dictionary.thefreedictionary.com/talus.

additional testing to rule out any possible neuropathic component. (R. 634). The doctor also prescribed amitriptyline for Plaintiff's pain.[2] (*Id.*).

When Plaintiff revisited Dr. Kulhman for a follow-up on February 24, 1998, she stated she had severe pain, but she had stopped using the amitriptyline because it made her "crazy." (R. 632). Dr. Kulhman noted that the testing he recommended came back with "unremarkable" results. (*Id.*). Plaintiff's neurological exam was also normal, except for slight tenderness in the ball of the foot and a minimal decrease in temperature perception in the toes. (*Id.*). Dr. Kulhman thought Plaintiff might have plantar fasciitis, or some other condition, but was not sure.[3] (*Id.*). He recommended an EMG and some other procedures to evaluate the "remote" possibility Plaintiff had a neurological disorder, and scheduled her for a follow-up in a few weeks. (*Id.*).

The record does not show whether Plaintiff had the EMG or other recommended testing, but does reflect that she had a follow-up with Dr. Kuhlman on April 16, 1998. (R. 630). At that time, Dr. Kulhman observed that Plaintiff displayed normal motor functioning, normal reflexes, and normal neurological examination results. (*Id.*). The doctor still thought Plaintiff's pain was not likely neurological in origin, but was not sure. (*Id.*). He recommended additional testing and a follow-up, as well as a consultation with a rheumatologist. (*Id.*). The record does not reflect whether Plaintiff followed any of these recommendations, or ever returned to see Dr. Kulhman again.

In July 1998, a few months after her last visit with Dr. Kulhman, Plaintiff visited a podiatrist, Dr. Myron I. Wolf, for a consultation regarding her foot and ankle pain. (R.

---

[2]    "Amitriptyline" is an antidepressant that is sometimes used off-label to treat pain. http://medical-dictionary.thefreedictionary.com/amitriptyline+hydrochloride.

[3]    "Plantar fasciitis" refers to an "inflammation of the plantar fascia, most usually noninfectious, and often caused by an overuse mechanism [that] elicits foot and heel pain." http://medical-dictionary.thefreedictionary.com/plantar+fasciitis.

629).  Dr. Wolf wrote a July 6, 1998 letter documenting the consultation.  (*Id.*).  Plaintiff reported "many months" of pain and swelling, and stated her symptoms had been progressing.  (*Id.*).  Dr. Wolf noted some tenderness and edema along Plaintiff's posterior tibial tendons during his examination, but her circulation and sensation were intact, with no deficit or burning into her digits.[4]  (*Id.*).  The doctor also noted Plaintiff's nerve conduction studies and MRI were normal, and demonstrated no boney pathology.  (*Id.*).  Dr. Wolf's impression was bilateral posterior tibial tendon syndrome.[5]  (*Id.*).  He recommended Plaintiff undergo diagnostic imagining focused on Plaintiff's posterior tibial tendon, and return for a follow-up.  (*Id.*).  The doctor also noted that custom-made shoe inserts and physical therapy treatments might be necessary to decrease Plaintiff's symptoms.  (*Id.*).  Following Dr. Wolf's letter in 1998, there are no further medical records until 2004.

### 2. 2004-2006

On August 26, 2004, Plaintiff sought treatment at Progressive Medical Center for a cough, stuffy nose, itchy throat, and wheezing.  (R. 488-90).  Plaintiff described a history of asthma and allergic rhinitis, and stated that she was taking Albuterol.[6]  (R. 488-89).  The doctor assessed Plaintiff with acute asthma exacerbation, to be treated by

---

[4]    "Edema" is "a condition of abnormally large fluid volume . . . in tissues between the body's cells."   http://medical-dictionary.thefreedictionary.com/edema.    The "posterior tibial muscle" controls the "plantar flexion and inversion of the foot."   http://medical-dictionary.thefreedictionary.com/posterior+tibial+muscle.

[5]    "Posterior tibial tendon syndrome" refers to the "progressive degeneration of posterior tibial tendon." http://medical-dictionary.thefreedictionary.com/posterior+tibial+tendon+dysfunction.

[6]    "Allergic rhinitis, more commonly referred to as hay fever, is an inflammation of the nasal passages caused by allergic reaction to airborne substances."   http://medical-dictionary.thefreedictionary.com/Allergic+Rhinitis.

using her Albuterol in a nebulizer, and allergic rhinitis, to be treated with Advair and Claritin. (R. 490). Plaintiff was told to follow-up in two weeks, but she did not return until about seven months later, in March 2005. (*Id.*).

When Plaintiff returned to the Progressive Medical Center in March 2005, she complained of chest congestion and displayed wheezing. (R. 491). The doctor recommended Advair, Claritin, and Medrol, and told Plaintiff to return when needed. (*Id.*). Plaintiff returned a little over a year later, on April 11, 2005. (R. 492). She complained of coughing, chest congestion and wheezing, and was recommended similar medications as before. (*Id.*).

The next chronological record is a letter dated July 15, 2005, from Plaintiff's husband's psychiatrist, Dr. Walter A. Pedemonte. (R. 448). The letter states that Plaintiff's husband was under Dr. Pedemonte's care for major depression and Parkinson's disease, that Plaintiff cares for her husband, and that she should apply for social security disability for financial assistance so she can care for her husband 24-hours a day. (*Id.*). The letter does not discuss any treatment provided to Plaintiff by Dr. Pedemonte, or whether she also had any psychiatric or medical conditions. (*Id.*).

Plaintiff returned to the Progressive Medical Center on March 29, 2006, about a year after her previous treatment, and about three months after her December 31, 2005 DLI. (R. 493). She had similar complaints as in her past visits, was recommended similar medications as before, and was told to return when needed. (*Id.*). There are no records showing Plaintiff returned for treatment at Progressive Medical Center again.

### 3. July 2006-April 2007

Plaintiff's next treatment records are from July 29, 2006, about seven months after her December 31, 2005 DLI. (R. 354). These records show Plaintiff was hit by a motor vehicle while riding her bicycle, resulting in fractures in several of her ribs and in her left femur. (R. 354-64; 378-406; 457-80). She was treated at Elmhurst Memorial Hospital, and required surgery on her femur, including the insertion of an intramedullary guide rod.[7] (R. 378-79). Plaintiff reported the ability to ambulate normally around her community, without the need for any assistive devices, before her accident. (R. 460). After her accident, Plaintiff required a walker, and engaged in daily physical therapy at Elmhurst for rehabilitation purposes. (R. 416-423; 521). She reported to her physical therapist that her goal was to return home to continue caring for her husband. (R. 423).

While she was in physical therapy, Plaintiff developed symptoms of post-traumatic stress disorder and requested psychiatric counseling. (R. 521). On August 9, 2006, she was examined by a psychiatrist at Elmhurst, Dr. Timony M. Cullinane. (R. 522-24). Plaintiff explained to Dr. Cullinane that she had depression due to her husband's illness and various employment and financial issues. (R. 522-24). She also stated that she developed tendonitis and plantar fasciitis around 1997, and had to stop working due to difficulty standing. (R. 522). Her husband was the main provider until about July 2000, when his tremors from Parkinson's disease became severe. (*Id.*). Plaintiff's husband then quit working, and she began working at a call center for Sak's, but lost the job in 2001 when the call center closed. (*Id.*). Her husband's condition worsened, and Plaintiff had to care for her husband, who could not eat, bathe or dress

---

[7]    An "intramedullary rod" is a "metal rod forced into the medullary cavity of long, weight-bearing bones (e.g., femur, tibia), which allows ambulation within weeks rather than months." http://medical-dictionary.thefreedictionary.com/intramedullary+rod.

himself. (R. 522-23). Caring for Plaintiff's husband was "psychologically challeng[ing]" for her. (R. 522). Plaintiff also had trouble finding work, so she and her husband lived off of money from a 2003 sale of some land, and her husband's social security disability benefits. (R. 522-23.).

Plaintiff told Dr. Cullinane that she had taken Zoloft due to feelings of depression, but stopped taking it in 2004. (R. 523). Plaintiff explained that her mood, concentration, and ability to sleep were good at that time, and she was physically active. (*Id.*). She said she had "everything under control," until her July 2006 accident. (*Id.*). Dr. Cullinane diagnosed Plaintiff with severe major depression (and he noted that this was her "first episode" of that illness), and post-traumatic stress disorder. (R. 524). The psychiatrist also found that in the past year Plaintiff's GAF score was a 75, but it was currently a 10.[8] He recommended Zoloft and sleep medication, and that Plaintiff be transferred to the psychiatric floor for further treatment if she did not adequately respond to the medication. (R. 524).

When Plaintiff became medically stable on August 19, 2006, she still felt she required psychiatric treatment, and was voluntarily admitted to the psychiatric floor at Elmhurst. (R. 424-25; 521). Plaintiff's doctors developed a treatment plan for her, which indicated, among other things, that she needed a resource for outpatient therapy upon discharge, because she was lacking an ongoing treatment relationship with a

---

[8]    GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed., Text Rev. 2000). A GAF score of 71–80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *Id.* A GAF score of 0 to 10 reflects a persistent danger of severely hurting self or others, a persistent inability to maintain minimal personal hygiene, or a serious suicidal act with clear expectation of death. *Id.*

mental health professional at that time. (R. 433-37). After receiving some treatment and medication at Elmhurst, Plaintiff was discharged on August 25, 2006, with prescriptions for various medications (Zoloft, Abilify, Miralax, Colace, and aspirin), and a recommendation to make an appointment with a home health aid. (R. 428). A few months later, on October 31, 2006, Dr. O'Connor recommended Plaintiff apply for "long term disability" because he thought her femur fracture would "most likely lead to long term impairment." (R. 449; 537). The next day, on November 1, 2006, Plaintiff applied for DIB. (R. 103, 290).

A few weeks later, on November 24, 2006, Plaintiff was treated by Dr. Pedemonte. (R. 618). Plaintiff complained at that time of feeling very depressed. (*Id.*). Under a section in his notes titled, "Present Psychiatric History," Dr. Pedemonte wrote that Plaintiff was run over by a car, which left her with expensive hospital bills since the driver did not have insurance. (*Id.*). He stated that this event was "delaying her recovery from depression" and had sent her back to "square number one." (*Id.*). Under "Past Psychiatric History," Dr. Pedemonte noted that Plaintiff described being depressed for many years, and stated she had tried to work in 2004, but could not work due to a severe panic disorder. (*Id.*).

On November 29, 2006, state agency consulting psychologist Dr. Helen Appleton, and state agency consulting physician Dr. Robert Patey, prepared reports related to Plaintiff's disability claim. (R. 591-604; 605-607). Dr. Appleton noted that Plaintiff told the physicians at Elmhurst she had depression and was taking Zoloft until 2004, and that she was doing okay from then until her accident in July 2006. (R. 603). Shortly thereafter, on August 9, 2006, Plaintiff was diagnosed with her "first episode of

Major Depression." (*Id.*). Plaintiff also claimed she was treated by Dr. Pedemonte prior to her December 31, 2005 DLI, but Dr. Pedemonte stated he had no file on Plaintiff. (*Id.*). Ultimately, Dr. Appleton determined that there was insufficient evidence to evaluate Plaintiff's mental health condition between January 1, 2003 and December 31, 2005. (*Id.*). Dr. Patey also determined that he was unable to assess Plaintiff's physical limitations before her DLI. (R. 607).

The SSA denied Plaintiff's application for DIB on December 8, 2006. (R. 103). On April 4 and 5, 2007, on reconsideration, DDS consulting physicians Dr. Carl Hermsmeyer and Dr. Frank Jimenez confirmed that there was insufficient information to assess Plaintiff's physical and mental capacities as of her DLI. (R. 622-624). As a result, the SSA denied Plaintiff's application for DIB again on April 13, 2007. (R. 104).

### 4. May 2007-October 2011

Plaintiff continued to receive treatments, and her physicians continued to generate notes and letters related to her conditions, for the next several years. Some of those records purport to contain information related to Plaintiff's condition before her December 31, 2005 DLI. On May 19, 2007, Dr. Pedemonte wrote a letter stating he was treating Plaintiff for major depression and severe anxiety, that she had been under his care for the last two years (i.e., since 2005), and that she was "unable to function well due to her underlying illness." (R. 653). That doctor's April 2008 notes also state he had been treating Plaintiff for major depressive disorder since 2005. (R. 735).

Other letters by Dr. Pedemonte describe him as treating Plaintiff during other time periods, and for different conditions. In Dr. Pedemonte's letter dated October 11, 2008, he states that he treated Plaintiff for major depression with psychotic features for

some number of years, but the number is not specified.  (R. 628).  In this same letter, the psychiatrist states that Plaintiff was "unable to function unless she takes her medications."  (*Id*.).  A February 14, 2009 letter by Dr. Pedemonte states he had been treating Plaintiff for major depression with psychotic features, post-traumatic stress disorder, and panic disorder for the last five to six years (i.e., since 2004 to 2005).  (R. 626).  Dr. Pedemonte again stated in this letter that Plaintiff was "unable to function minimally unless she takes her medications."  (*Id*.).  The doctor further explained that Plaintiff "started to have severe psychiatric problems since 2003-2004," that he saw her and her husband "together since 2003-2004," and that her mental stability got much worse after her bicycling accident  (*Id*.).

In a November 27, 2010 letter, Dr. Pedemonte states that he had been treating Plaintiff for major depression with psychotic features, anxiety disorder, and post-traumatic stress disorder for the last eight years (i.e., since 2002).  (R. 656).  This letter further states that Plaintiff suffered from a number of physical and mental illnesses over her lifetime, and that she is unable to function even when taking her prescribed medications.  (*Id*.).  Finally, on October 10, 2011, Dr. Pedemonte wrote a letter stating he had been treating Plaintiff's husband since 2003, and Plaintiff since 2004-2005.  (R. 697).  Dr. Pedemonte states that Plaintiff would accompany her husband for treatment, and since she did not have insurance, he would treat her at her husband's appointments for a very small fee.  (*Id*.).  The psychiatrist went on to explain that he lost all his past patient files in early 2008, due to a "computer glich," implying that this is why he does not have past records for Plaintiff.  (*Id*.).  He said he started treating Plaintiff by giving her medication samples for depression, anxiety and post-traumatic stress

disorder, conditions that he determined she had suffered from since childhood, due to several traumatic events. (*Id.*). He concluded by stating that Plaintiff has been "unable to function" due to her disorders during the entire time he treated her, including while she was on medications. (*Id.*).

In October 2011, Plaintiff was evaluated by psychiatrist Dr. Mark A. Amdur, who wrote an October 24, 2011 letter detailing his examination. (R. 742-46). Dr. Amdur's letter explains that he evaluated Plaintiff at her attorney's request, and that he conducted the evaluation in her home, with her husband present, but did not have any medical records available to review. (R. 742.). Plaintiff told Dr. Amdur that she had felt anxious "ever since I was born" and that her anxiety caused many problems, including chronic bowel problems and rapid heartbeat. (*Id.*). Plaintiff further explained that she had a history of depression, including daily crying spells since 2000, suicide attempts in 1979 and 2011, and nightmares. (*Id.*). Dr. Amdur asked Plaintiff questions meant to elicit obsessive-compulsive symptomology, and she described a lifelong compulsive hand-washing problem related to germ phobia. (*Id.*).

Plaintiff also explained her job history, stating that she had left her printing company job due to problems in her feet, and that she was unable to work since 2002 due to anxiety and panic attacks. (R. 743-744). When asked why her past disability benefits applications did not reference psychiatric signs or symptoms, Plaintiff stated that she had been reluctant to reveal her psychiatric issues at that time. (R. 744). Dr. Amdur also noted that Plaintiff has housekeeping assistance, and that her husband required personal assistance as well. (R. 744-45). The psychiatrist diagnosed Plaintiff with chronic major depression, post-traumatic stress disorder with panic, withdrawal and

prominent obsessive-compulsive symptomology, and opined that her obsessive-compulsive symptomology was "longstanding." (*Id.*).

**B.      Plaintiff's Activities of Daily Living Questionnaire and Testimony**

Plaintiff completed an undated Activities of Daily Living Questionnaire in connection with her application for DIB. (R. 309-313). She stated that her depression caused her to not write or use the phone very much, sometimes made her forget to groom herself or shower, and caused her concentration problems. (R. 309). Plaintiff also said that her depression, anxiety and panic attacks caused her to drive less, not leave the home unless necessary (such as for weekly grocery shopping), and rest a lot during the day. (R. 310). She cannot cook because she burns food due to forgetfulness, and thus only makes cold sandwiches, cereal and fruit for all her meals. (R. 312-13). Her conditions also cause her problems caring for her home (she will do dusting, but no other chores) and her disabled husband. (R. 311-12).

Plaintiff also has trouble sleeping, including because of nightmares, and her medication also makes her drowsy, which impairs her concentration. (R. 313). She stated that her conditions began in 1998. (*Id.*). In a Disability Report submitted in support of her application, Plaintiff indicated she had worked at a printing company from September 1989 to 1997, for ten hours a day, five days a week; as a customer service operator from July 2000 to January 2001, for eight hours a day, five days a week; and as an assistant manager of a doctor's office in September 2004, for seven hours a day, four days a week. (R. 291).

Plaintiff also testified at the October 27, 2011 hearing before the ALJ. (R. 35). She said she received treatment in the late 90s for her ankle and foot pain, including

physical therapy, special orthotics, and medication, and the treatments "sort of" resolved her pain. (R. 40-41). But she stopped working in 1997 due to her feet problems. (R. 48). Plaintiff uses an inhaler and nebulizer for her asthma, and could not recall any emergency room visits or hospitalizations for respiratory distress between January 2003 and December 31, 2005. (R. 41-42). Regarding her mental health, Plaintiff stated that she was being treated (along with her husband) by Dr. Pedemonte starting in 2000, for extreme anxiety and depression. (R. 42-43, 54). Dr. Pedemonte treated her by giving her various medications that did not work as much as she or the psychiatrist would have liked. (*Id.*). Plaintiff was not hospitalized before December 31, 2005 for any mental health symptoms, but could not recall if she had to visit any emergency rooms. (R. 43). But she suffered panic attacks and anxiety which caused her to hide in the bathroom and made her unable to keep up with her job duties at work. (R. 50-52). She said these problems caused her to lose her job at Saks (in 2002) and her job at her doctor's office (in 2004). (R. 50-52).

Plaintiff described caring for her husband before her July 2006 bicycling accident, including by helping him move around and giving him medication. (R. 43-44). A neighbor came once a week to help with housework, although she would try to do household chores as well. (R. 44, 46, 48). After the accident, a housekeeper visits three times a week, to help with bathing Plaintiff's husband, and doing laundry and housekeeping. (R. 44). Plaintiff could not drive much before December 31, 2005 because her medications, Zoloft and Ativan (which she had been taking since 2000), made her dizzy. (R. 45). Plaintiff also said she would not go to the store often because she could have groceries delivered, and did not go out for any social activities or

entertainment. (R. 46, 49). Plaintiff has a cell phone to check on her husband when she leaves the home without him, but also said she does not leave the home without him. (R. 49-50). Plaintiff explained that she could only walk about a block due to pain in her feet, ankles and lower back, which she has had since before December 31, 2005. (R. 46-47). She also could only stand or sit for about an hour and needed to keep moving because she cannot "keep a still position." (R. 47). And she was limited to lifting about five pounds, including before December 31, 2005. (*Id.*).

## C. Medical Expert's Testimony

Dr. Kathleen O'Brien testified at the hearing as an ME. (R. 35). Dr. O'Brien stated that Plaintiff has an ongoing diagnosis of major depressive disorder, and was diagnosed with generalized anxiety disorder in 2006 and 2007, but that diagnosis was later removed. (R. 56). Based on the record, and considering the effects of Plaintiff's medication, Dr. O'Brien determined that she has mild difficulties with activities of daily living, and moderate difficulties with social functioning, concentration, persistence and pace, but no episodes of decompensation. (R. 56-57). Plaintiff should also be restricted to simple routine tasks and would do better in an environment that did not involve working with the public and only occasional contact with supervisors and peers. (R. 57). However, Plaintiff did not have any of these restrictions on or before the DLI of December 31, 2005. (*Id.*).

## D. Vocational Expert's Testimony

Aimee Mowery testified at the hearing as a VE. (R. 35). Ms. Mowery testified that Plaintiff's past work was as a printing machine operator (semi-skilled, medium work), in customer service (skilled, sedentary work), and as a telephone operator (semi-

skilled, sedentary work).  (R. 63).  Ms. Mowery stated that a person of Plaintiff's age, education and work experience who is restricted to light work, occasionally uses the lower extremities for pushing and pulling, occasionally climbs ramps or stairs, balancing, stopping, couching, kneeling and crawling, should never climb ladders, ropes or scaffolding, and who should avoid concentrated exposure to lung irritants, could perform Plaintiff's past work as a customer service and telephone operator positions.  (R. 63-64).  That hypothetical person could also perform other jobs, such as a ticket taker (and there were 3,857 such positions in the regional economy where Plaintiff resides), information clerk (3,010 positions in the regional economy), and general office clerk (6,883 positions in the regional economy).  (R. 64).

**E.     Administrative Law Judge's Decision**

The ALJ found that Plaintiff's asthma and bilateral posterior tibial tendon syndrome were severe impairments, but she did not have an impairment, or combination of impairments, that met or medically equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, up through the December 31, 2005 DLI. (R. 20-23).  After reviewing the medical evidence, the ALJ determined that, through the DLI, Plaintiff had the capacity to perform light work, with occasional use of the lower extremities to push and pull and occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps and stairs.  (R. 23).  The ALJ further found that Plaintiff could not climb ladders, ropes, or scaffolds and should have avoided concentrated exposure to lung irritants.  (*Id.*).  In reaching this conclusion, the ALJ declined to give controlling weight to the opinion of Plaintiff's treating psychiatrist, Dr. Walter A.

Pedemonte, but gave some weight to the opinions of Dr. Myron I. Wolf and the ME, Dr. O'Brien. (R. 25-26).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff was capable of performing her past relevant work as a telephone operator and in customer service through her DLI. (R. 26). The ALJ also accepted the VE's testimony that someone of Plaintiff's age, education, work experience and RFC would have been able to perform other jobs, such as a ticket taker, information clerk, and general office clerk. (R. 26-27). The ALJ thus concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time prior to her DLI, and is not entitled to benefits. (R. 27-28).

## DISCUSSION

### A.  Standard of Review

Judicial review of the ALJ's decision, which constitutes the Commissioner's final decision, is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). That decision will be upheld "so long as it is supported by 'substantial evidence' and the ALJ built an 'accurate and logical bridge' between the evidence and her conclusion. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (quoting *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). An ALJ need not mention every piece of evidence in her decision, as long as she does not ignore an entire line of evidence that is contrary to her conclusion. *Id.* (citing *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). Although the Court will not reweigh the evidence or substitute its judgment for that of the ALJ, a decision that "lacks adequate discussion of the issues will be remanded." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *see also id.* (the

ALJ's articulated reasoning must be sufficient to allow the reviewing court to assess the validity of the agency's findings and afford a claimant meaningful judicial review).

## B.  Five-Step Inquiry

To qualify for DIB under Title II of the Social Security Act, a claimant must establish that she suffers from a "disability" as defined by the Act and regulations. *Infusino v. Colvin,* 12 CV 3852, 2014 WL 266205, at *7 (N.D. Ill. Jan. 23, 2014); *Gravina v. Astrue*, 10-CV-6753, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012).  A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423 (d)(1)(A); *see also Infusino,* 2014 WL 266205, at *7; *Gravina*, 2012 WL 3006470, at *3.  Furthermore, DIB benefits are only available to persons who meet the insured status requirements of the Act, and thus a claimant must be disabled before his or her DLI to be eligible for benefits.  *See Hardesty v. Astrue,* 435 F. App'x 537, 538-39 (7th Cir. 2011) (citing 42 U.S.C. §§ 413, 423(a), (c)).

In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Simila*, 573 F.3d at 512-13 (citing *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)).

**C.     Analysis**

**1.     Physical RFC Assessment**

**a.     Plaintiff's Asthma**

Plaintiff first argues that the ALJ failed to properly consider her asthma when assessing her physical RFC.  (Doc. 22, at 8-10; Doc. 28, at 4-5).  Residual functional capacity is defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a).  "When determining the RFC, the ALJ must consider all medically determinable impairments . . . .'" *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).  "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012) (citations omitted).  *See also* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).  Here, the ALJ considered that Plaintiff had a history of asthma, and had been treated for several incidences of acute asthma exacerbation in August 2004, March and April 2005, and March 2006.  (R. 25).  As a result, the ALJ incorporated an environmental limitation into the RFC determination that Plaintiff must "avoid[] concentrated exposure to lung irritants." (R. 23).

Plaintiff admits that the ALJ found she should "avoid[] concentrated exposure to lung irritants" to prevent exacerbations of her asthma, but argues that this environmental limitation in the RFC assessment is insufficient.  (Doc. 22, at 9; Doc. 28, at 4-5).  Plaintiff argues that the ALJ failed to properly consider her episodes of asthma exacerbation and the treatments she received from August 2004 through April 2005.

(Doc. 22, at 8). On the contrary, as stated above, the ALJ described Plaintiff's history of asthma and cited her asthma treatment records from August 2004 through March 2006 in the decision. (R. 25). The ALJ also noted that Plaintiff was treated and released for these incidents on an outpatient basis, rather than being hospitalized. (*Id.*; *see also* R. 23). Plaintiff fails to cite any evidence that the ALJ ignored or misconstrued. Instead, the ALJ's summary of this evidence, while brief, is accurate.

Plaintiff also relies on *Jones v. Astrue*, No. 11 CV 3958, 2012 WL 4120417 (N.D. Ill. Sept. 18, 2012), to support her argument that the ALJ's environmental limitation of "avoiding concentrated exposure to lung irritants" was insufficient, but *Jones* is inapplicable here. (Doc. 27, at 4-5). In *Jones*, the claimant's allergist opined that her asthma and allergies required her to avoid exposure to cigarettes, perfumes, cleaning solvents, extreme temperatures, dust, and other things. *Id.* at *3. Based on this and other evidence, the ALJ incorporated an environmental limitation preventing that claimant from working around "high levels of dust and fumes," and the district court upheld that conclusion. *Id.* at *5, 8-10. Here, none of Plaintiff's physicians identified any specific or greater environmental limitations than the ALJ found. Instead, the ALJ's RFC determination that Plaintiff should avoid concentrated exposure to lung irritants is sufficiently articulated, and supported by substantial evidence.

### b. Plaintiff's Capacity for Light Work

Plaintiff also challenges the ALJ's determination that she was capable of performing light work before her DLI, despite the fact that she suffered from bilateral posterior tibial tendon syndrome. (Doc. 22, at 9-10; Doc. 28, at 1-4). Plaintiff specifically challenges the ALJ's finding that she could walk or stand for up to six hours

in an eight hour workday, as required for someone capable of light work.  (*Id.*).  *See also* SSR 83-10, 1983 WL 31251, at * 6 (S.S.A. 1983) ("[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.").  Plaintiff argues that the ALJ erroneously ignored evidence that she had difficulty walking, standing and sitting for long periods of time before her DLI.  (Doc. 22, at 3-4; Doc. 28, at 2-3).  In addition to ignoring evidence, Plaintiff claims that the ALJ failed to explain how she reached her conclusion regarding Plaintiff's capability to perform light work.  Rather than basing the RFC determination on medical evidence in the record, Plaintiff argues that the ALJ made an "independent medical determination" and "played doctor."  (Doc. 28, at 4 (quoting *Rohan v. Charter*, 98 F. 3d 966, 970 (7th. Cir. 1996)).  Plaintiff's arguments have no merit; the ALJ's decision showed she considered Plaintiff's treatment records and sufficiently explained the basis for the RFC determination, which was logical and supported by the record.

In this regard, the ALJ correctly noted that the record contained evidence that Plaintiff was treated in 1997 and 1998 for foot problems that were eventually diagnosed as bilateral posterior tibial tendon syndrome.  (R. 22, 24).  Although the ALJ did not discuss all of these records in detail, her brief summary of the records and citation to them shows she considered them.  *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) ("The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and his conclusions.") (quoting *Clifford*, 227 F.3d at 872).  The ALJ then gave a detailed explanation of the most recent, pre-DLI treatment record discussing Plaintiff's foot condition:  Dr. Wolf's July 6, 1998 letter.  (R. 25).  The ALJ noted that Dr. Wolf diagnosed Plaintiff with bilateral posterior

tibial tendon syndrome, but found that Plaintiff had intact circulation, with no deficit or burning into the digits at that time, and her MRI and nerve condition studies had produced "normal" results. (*Id.*). Also, Dr. Wolf had recommended custom-made shoe inserts and physical therapy to alleviate Plaintiff's symptoms. (*Id.*).

After describing Dr. Wolf's letter, the ALJ stated that she took Dr. Wolf's findings into consideration in determining the physical RFC, and that there was "no evidence of any greater limitations" than Dr. Wolf described. (R. 25.). The ALJ discussed that the record contained no evidence of treatment for this condition around the time Plaintiff allegedly became disabled (January 1, 2003), or the DLI (December 31, 2005); instead, the ALJ noted that the only treatment records were from 1997 and 1998. (R. 22, 24-25). The ALJ also observed that after the 1997 and 1998 treatments, Plaintiff continued to engage in physical activities, such as bicycling, and reported working at a job that she did not leave because of physical symptoms. (R. 21, 23-24, 26). By discussing the foregoing in the opinion, the ALJ satisfied her requirement to minimally articulate her reasons for finding Plaintiff capable of light work, and the record supports her conclusion.

Plaintiff also argues that her testimony is sufficient evidence to establish she was disabled before her DLI, so long as she provides some evidence showing she had a medically determinable impairment that arose before her DLI. (Doc. 22, at 10; Doc. 28, at 2-4, 6). She further argues that the ALJ was required to find her disabled based on her testimony, if there was no medical evidence showing she was less limited than she described. (*Id.*). Plaintiff cites *Golembiewski v. Barnhart*, 322 F.3d 912 (7th Cir. 2003)

and *Scott v. Astrue*, 647 F.3d 734 (7th Cir. 2005) in support of her argument, but neither of those cases support Plaintiff's position.

In *Golembiewski*, the claimant testified that he periodically dropped items, and provided a medical opinion by his family practitioner, dated only two weeks after his DLI, that he had problems grasping objects because of tingling in his hands. 322 F.3d at 918. The ALJ in that case ignored that evidence, rather than inquiring of the family practitioner whether and to what extent the claimant's grasping problems existed before his DLI. (*Id.*). Here, Plaintiff cites no physician's opinion or other medical evidence, including any evidence from around her DLI, which the ALJ ignored. Rather, the ALJ considered the medical evidence Plaintiff provided (records of treatments that occurred over four years before her alleged disability onset date, and over seven years before her DLI) in determining the RFC.

In *Scott v. Astrue*, the claimant testified that shaking in her hands made it difficult for her to hold things, and she supplied supporting medical evidence that she had difficulty using her hands due to tremors. 647 F.3d at 737, 740-41. In this case, Plaintiff did not supply medical evidence discussing how long she could walk, stand or sit on or before her DLI. Rather, as the ALJ found, there were a handful of treatment notes in the record from 1997 and 1998, followed by a dearth of medical evidence between July 1998 and Plaintiff's December 31, 2005 DLI. Nothing in the cases Plaintiff cites suggests that the ALJ must weigh the lack of medical evidence supporting Plaintiff's testimony in her favor. Instead, Plaintiff "bears the burden of supplying adequate records and evidence to prove [her] claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (quoting 20 C.F.R. § 404.1512(c)) ("You must provide medical

evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."). The ALJ's conclusion that Plaintiff failed to meet her burden is supported by substantial evidence.

### 2. Treating Psychiatrist's Medical Opinion

Plaintiff argues that the ALJ erred in analyzing the opinion of her treating psychiatrist, Dr. Walter A. Pedemonte, that she suffered from several psychological disorders since childhood, and was unable to function well even when taking her prescribed medications. (Doc. 22, at 10-13; Doc. 28, at 6-7). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott*, 647 F.3d at 739; *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion. *Scott*, 647 F.3d at 739. But a physician's opinion that a claimant is disabled is not entitled to controlling weight or any special significance, because the Commissioner is responsible for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1527(d); *Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012) (Commissioner shall not give any special significance to statement by medical source that claimant cannot work); *Dampeer v. Astrue*, 826 F. Supp. 2d 1073, 1082 (N.D. Ill. 2011) ("[W]hether Claimant is 'disabled' is an administrative finding reserved for the Commissioner rather than a medical opinion.").

Plaintiff specifically contends that the ALJ should have credited Dr. Pedemonte's letters because his opinions remained "consistent" concerning her "medical well-being." (Doc. 22, at 12-13; Doc. 28, at 7). She also argues that the ALJ failed to consider that

Dr. Pedemonte reported treating her "since at least 2003," and specialized in psychiatry, despite the fact that the regulations require ALJs to consider the length of the treating relationship and a physician's specialty when evaluating a treating source's opinion. (Doc. 22, at 11-12). Contrary to Plaintiff's arguments, the ALJ's decision reflects a consideration of the consistency of Dr. Pedemonte's opinions, his specialization, and the length and nature of the treating relationship, as explained below.

The ALJ described Dr. Pedemonte as a psychiatrist who was treating Plaintiff for mental health problems, and noted that he opined in several letters that she was unable to function, or disabled, before her December 31, 2005 DLI. (R. 21, 24-25). The ALJ properly determined that Dr. Pedemonte's opinion that Plaintiff was disabled is not entitled to controlling weight or any special significance. (R. 25). The ALJ also found that Dr. Pedemonte's opinion was not "well-supported by other substantial evidence or the objective medical evidence of record." (*Id.*). The ALJ discussed that Dr. Pedemonte's July 15, 2005 letter described Plaintiff as caring for her husband at that time, which was inconsistent with his other statements that she was unable to function. (R. 24-25.). That letter also did not indicate Plaintiff was being treated for, or even had, depression and anxiety. (R. 24.). The ALJ also noted that Dr. Pedemonte's November 2006 treatment notes related Plaintiff's symptoms to her post-DLI, July 2006 accident. (*Id.*).

The ALJ also found that Dr. Pedemonte's opinion was inconsistent with Plaintiff's psychiatric treatment notes from Elmhurst Memorial Hospital. In contrast to Dr. Pedemonte's letters stating that Plaintiff could not function prior to her DLI, the Elmhurst records stated she cared for her husband prior to her accident, and that her depression

and post-traumatic stress disorder arose out of the accident. (*Id.*). Those records also noted that Plaintiff was not in an ongoing treatment relationship for psychiatric care at that time, in contrast to some of Dr. Pedemonte's statements that he was treating her during this period. (*Id.*).

Dr. Pedemonte's notes and letters contained a number of inconsistencies that caused the ALJ to determine that his "veracity [wa]s questionable." (R. 25). These included Dr. Pedemonte's various inconsistent statements about when he began treating Plaintiff, and for how long. (R. 24). The ALJ also found that the psychiatrist's statement implying that he could not provide Plaintiff's past medical records because he lost them in a 2008 "computer glich" was inconsistent with his other actions. (R. 24-25). Specifically, in 2007 (before the "computer glitch" and thus when the psychiatrist still should have possessed all his patient files), Dr. Pedemonte provided treatment records to the agency in support of Plaintiff's claim that only went back to November 2006. (*Id.*). The ALJ found this implied that records before November 2006 never existed, not that they were lost, as Dr. Pedemonte suggested. (R. 21-22). As a result of the foregoing, the ALJ declined to afford controlling weight to Dr. Pedemonte's opinion. (R. 25). The ALJ's discussion articulates sufficient reasons for discounting the weight of Dr. Pedemonte's opinion, and those reasons are substantially supported by the record.

Plaintiff also contends that the ALJ erred by relying on the fact that Dr. Pedemonte could not produce records prior to November 2006 to discount his opinion, since Dr. Pedemonte explained that the records were lost due to a computer malfunction. (Doc. 22, at 11-13; Doc. 28, at 7). Plaintiff misstates the ALJ's reasoning; the ALJ did not "make a negative inference . . . based on the absence of medical

records." (Doc. 28, at 7). Rather, the ALJ determined that Dr. Pedemonte's veracity was questionable because the record suggested that his pre-November 2006 treatment notes concerning Plaintiff never existed, not that they were lost, as he claimed in his October 10, 2011 opinion letter. This finding merely reflects that the ALJ appropriately considered the consistency of Dr. Pedemonte's statements in the opinion with the record, including his own treatment notes, as the regulations require. *See* 20 C.F.R. § 404.1527(c)(2)-(6). Plaintiff has not shown that the ALJ committed any reversible error in analyzing Dr. Pedemonte's opinion.

### 3. Credibility Determination

Plaintiff also argues the ALJ erred in determining that her testimony that she could only walk up to a block, stand or sit for an hour, and lift up to five pounds prior to her DLI was not persuasive. (Doc. 22, at 13-15; Doc. 28, at 5-6). In assessing a claimant's credibility, an ALJ must first determine whether the claimant's symptoms are supported by medical evidence. *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822. S*ee also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). An ALJ's credibility determination must contain specific reasons for the credibility finding that are supported by evidence in the record, but the credibility determination will normally be reversed only if "patently

wrong." *Craft*, 539 F.3d at 678; *Schreiber v. Colvin*, 519 F. App'x 951, 960 (7th Cir. 2013).

The ALJ gave several reasons for finding that Plaintiff had overstated the extent of the severity of her impairments before her DLI. (R. 24). As discussed above, the ALJ found there was a lack of objective medical evidence supporting Plaintiff's testimony. (R. 22, 24-25). The ALJ also noted inconsistencies in Plaintiff's statements, and between her testimony and the record. For example, the ALJ discussed Plaintiff's equivocal testimony about using a cell phone to check on her husband when she leaves the home, while also denying that she left the home without him. (R. 23-24). The ALJ also considered Plaintiff's activities of daily living, and noted that both she and her doctors reported that she was providing care for her disabled husband prior to her July 2006 accident. (R. 24). Plaintiff also reported caring for her husband after her accident "to some extent," albeit with more assistance from others. (R. 25-26). Based on the foregoing, the Court finds that the ALJ adequately considered the entire record in making her credibility determination, and gave specific reasons for that finding that are supported by the record.

Plaintiff asserts that the ALJ erred by not crediting her statements about her limitations in walking, standing and sitting despite finding that her bilateral posterior tibial tendon syndrome was a "severe impairment" at Step Two. (Doc. 22, at 14; Doc. 28, at 6). There is no erroneous inconsistency in the ALJ's Step Two finding and her credibility determination. The severity finding at Step Two is only "an initial step in the entire process of making a disability determination." *Taylor v. Schweiker*, 739 F.2d 1240, 1243 (7th Cir. 1984); *see also id.* at n. 2 (discussing that the Step Two analysis is

"essentially an initial screening device which eliminates the need for further consideration only when the limitations alleged and supported by the record can be viewed as slight") (citing 20 C.F.R. § 404.1521(a)). "[T]he next steps would be for the ALJ to determine if the impairment meets or exceeds the regulatory description of certain disabling conditions and, if not, whether the impairment prevents her returning to her former work and also prevents her from performing other work available within the economy." *Id.* Those steps were followed in this case. Just because the ALJ found Plaintiff's bilateral posterior tibial tendon syndrome was a "severe" impairment at the beginning of the disability determination does not mean that she has to credit Plaintiff's testimony about how that impairment limited her functioning.

In support of her argument, Plaintiff cites an American Academy of Orthopedic Surgeons article which states that "[s]ome patients can have trouble walking or standing for a long time" due to bilateral posterior tibial tendon syndrome. (Doc. 22, at 14; Doc. 28, at 6). She argues that this evidence shows her condition could cause the symptoms she claims to suffer. (*Id.*). Although some people could be limited in walking or standing due to bilateral posterior tibial tendon syndrome, the fact that Plaintiff was diagnosed with an impairment that could cause disabling symptoms does not mean that the ALJ must credit her testimony about those symptoms. *See Estok v. Apfel*, 152 F.3d 636, 640 (a claimant must establish disability during the insured period; that she received a diagnosis of an impairment with an onset date prior to the DLI is not enough). It is also worth noting that Dr. Wolf's letter reports an initial impression after a single consultation, subject to further testing, and the record does not show that Plaintiff underwent that testing, or obtained a definitive diagnosis.

Plaintiff also contends that the ALJ erred by relying on the fact that she provided some care to her disabled husband to discount her credibility, because caring for her husband with the help of others does not "translate into the ability to do full-time work." (Doc. 22, at 14-15).  However, as the Commissioner argues, the ALJ did not find that Plaintiff's activities were "commensurate with an ability to work."  (Doc. 27, at 11) (quoting *Archer v. Astrue*, No. 09 C 4705, 2011 WL 720193, at *11 (N.D. Ill. Feb. 22, 2011)).  Instead, the ALJ merely took into consideration that Plaintiff aided her husband with his mobility and personal care on a daily basis, including before her DLI.  (R. 24, 26).  Indeed, Plaintiff explicitly testified that before her July 2006 accident, she was taking care of her husband, including helping him get around, such as from the couch to the table, and helping him take his medication.  (R. 43-44).

As Plaintiff admits, the ALJ also acknowledged that she was getting help from a housekeeper once a week before her accident, and was getting more frequent and extensive help after her accident, in caring for her husband.  (Doc. 22, at 15; R. 23, 26).  But the ALJ explained that despite this help, it still appeared the claimant was providing "daily" care for her husband, who had limited mobility due to Parkinson's disease.  (R. 26).  These activities "are exactly the type of factors the ALJ was required to consider" in evaluating the credibility of Plaintiff's subjective complaints of pain and disability, under the rulings and regulations.  *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013) (citing S.S.R. 96–7p, 1996 SSR LEXIS 4, at *7–8).  Plaintiff has not shown that the ALJ's credibility finding "lacks any explanation or support" and is deserving of reversal. *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008); *see also Simila*, 573 F.3d at 517

(an ALJ's credibility determination is entitled to "deference, for an ALJ, not a reviewing court, is in the best position to evaluate credibility").

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion to Reverse the Decision of the Commissioner of Social Security (Doc. 22) is denied, and Defendant's Motion for Summary Judgment (Doc. 26) is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: September 15, 2014

SHEILA FINNEGAN
United States Magistrate Judge